**FILED - LN**
September 10, 2018 4:04 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: ___ila_/___   SCANNED BY: _____ 9/12

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| A.G. DOE and A.W. DOE | |
| **Plaintiffs,** | |
| v. | **1:18-cv-1016** |
| MICHIGAN STATE UNIVERSITY; THE MICHIGAN STATE UNIVERSITY BOARD OF TRUSTEES; LAWRENCE GERARD NASSAR (individual capacity only); WILLIAM D. STRAMPEL, D.O. (individual capacity only); JEFFREY R. KOVAN D.O. (individual capacity only); DOUGLAS DIETZEL, D.O. (individual capacity only); KATHIE KLAGES (individual Capacity only); GARY E. STOLLAK (individual capacity only); BROOKE LEMMEN, D.O. (individual capacity only); DESTINY TEACHNOR-HAUK (individual capacity only); LIANNA HADDEN (individual capacity only); USA GYMNASTICS, INC.; STEVE PENNY; TWISTARS USA, INC. d/b/a GEDDERTS' TWISTARS USA GYMNASTICS CLUB, DEBRA VAN HORN, JOHN GEDDERT and UNITED STATES OLYMPIC COMMITTEE, jointly and severally | Gordon J. Quist - US District Judge<br>Ellen S. Carmody - US Magistrate Judge |
| **Defendants.** | |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF AND JURY DEMAND

### PRELIMINARY STATEMENT

1.     From his earliest days as an athletic trainer in the 1990's, Defendant Lawrence Gerard Nassar ("Nassar") was already sexually assaulting young athletes entrusted to his care by digitally penetrating them in the vagina and anus under the guise of treating physical ailments in the limbs and back or conducting medical research.

2.     Nassar perpetrated these "treatments" on the children and young athletes in his care without consent from them or their parents.

3.     Nassar took active measures during "treatment" sessions to hide his unlawful conduct from parents and guardians present, and even from other medical professionals assisting him.

4.     Nassar often made sexually explicit comments and discussed his young patients' sex lives and sexuality during his "treatments."

5.     Nassar often became sexually aroused during his treatments of these children and young women and even made sure that his patients could feel his erect penis.

6.     The Defendant institutions and individuals named in this lawsuit knew that Nassar had committed hundreds of sexual assaults on the patients and athletes they entrusted to his care.

7.     The Defendant institutions and individuals named in this lawsuit;

a. hid their knowledge of Nassar's abuse from Plaintiffs and their parents and guardians;

b. failed to take actions to end Nassar's abuse and prevent this abuse from continuing, and instead, continued to represent to Plaintiffs and their parents and guardians that Nassar was a preeminent practitioner whose techniques were unparalleled and not to be questioned.

8.     The recent revelations of Nassar's massive sexual abuse of girls and young women under the guise of medical treatment, and the complicityof the organizations and individuals named in this lawsuit have received extensive media attention and is known worldwide as the "MSU/Nassar Scandal."

9.     This lawsuit seeks damages and other legal and equitable remedies for Plaintiffs who were minors when Nassar assaulted them under the guise of medical treatment.

10.     Plaintiffs seek to establish a Truth and Reconciliation Commission, or a similar government sanctioned public forum requiring all Defendants and their agents and employees to fully and unequivocally admit their responsibility for permitting, condoning and promoting Nassar's abhorrent behavior and lying to cover it up his misconduct, as well as admitting to their own culpability for the unspeakable harm caused to Plaintiffs.

## PARTIES, JURISDICTION AND VENUE

### A. Plaintiffs

11.    Plaintiffs A.G. DOE and A.W. DOE are females and residents of the City of Mason, Ingham County, Michigan. They were minors during the time that they were sexually assaulted by Nassar.

### B. Defendants

12.    Defendant Lawrence "Larry" Nassar was a Doctor of Osteopathic Medicine and at all relevant times, resided in Michigan. Nassar is currently incarcerated and upon information and belief, is in the custody of the Federal Bureau of Prisons.

13.    Defendant Michigan State University ("MSU") is a public university organized under the laws of Michigan.

14.    Defendant Michigan State University Board of Trustees of ("MSU Trustees") is the governing body for MSU.

15.    Defendant MSU and MSU Trustees are collectively referred to herein as "MSU."

16.    From December, 2001 until April, 2002, Defendant William D. Strampel, D.O., ("Strampel") served as Acting Dean of the School of Osteopathic Medicine at MSU. Strampel service as Dean began in April, 2002 and continued until December, of 2017, when he resigned. Strampel is currently

4

subject to a criminal indictment in Michigan in connection with his role in the MSU/Nassar Scandal.

17.    Defendant Jeffrey Kovan, D.O.("Kovan") served as the Director of Sports Medicine at MSU-Kalamazoo Center for Medical Studies from 1991 to 1995, and thereafter as the Director of Sports Medicine at MSU. He remains the Director of Sports Medicine and head team physician for MSU.

18.    Defendant Douglas Dietzel, D.O., ("Dietzel") has been employed by MSU as the Clinical Director of Sports Medicine since approximately 2004.

19.    Defendant Kathie Klages ("Klages") began coaching gymnastics at MSU in 1990, and served as the Women's Gymnastics Coach until her employment terminated in February, 2017.  Klages is currently subject to a criminal indictment in Michigan in connection with her role in the MSU/Nassar Scandal.

20.    Defendant Gary Stollak ("Stollak") began working as a faculty member with a specialization in child psychology and early childhood development for MSU's Department of Psychology in 1966 until he retired as a Professor Emeritus in 2010.

21.    Defendant Lianna Hadden ("Hadden") began working at MSU in 2000 as an athletic trainer and continues to serve as an athletic trainer at MSU.

22.     Defendant Destiny Teachnor-Hauk ("Teachnor-Hauk) began working as an athletic trainer at MSU in 1997 and continues to work as an athletic trainer at MSU.

23.     Defendant Brooke Lemmen, D.O.("Lemmen") was employed as a physician with the MSU Sports Medicine Clinic from 2010 to 2017.

24.     Defendants Strampel, Kovan, Dietzel, Klages, Stollak, Hadden, Teachnor-Hauk, and Lemmen are collectively referred to herein as the "MSU Individual Defendants."

25.     At all relevant times, MSU Individual Defendants acted within the scope of their employment or agency with MSU.

26.     At all relevant times, Defendants MSU, MSU Trustees, and MSU Individual Defendants were acting under color of law, namely under color of statutes, ordinances, regulations, policies, customs, and/or usages of the State of Michigan and/or Defendant Michigan State University.

27.     Defendant USA Gymnastics ("USAG") was and continues to be an organization incorporated in Indiana, authorized to conduct business and conducts business throughout the United States including, but not limited to, the State of Michigan.

28.     Defendant Steve Penny ("Penny")was the president of Defendant USAG from approximately April, 2005 to March 2017, who was responsible for the overall management and strategic planning of Defendant USAG.

29.     At all relevant times, Defendant Penny acted within the scope of his employment or agency with USAG.

30.     Robert Colarossi ("Colarossi") is the past president of Defendant USAG and held the position from approximately 1998 to 2005 and during that time was responsible for the overall management and strategic planning of Defendant USAG.

31.     At all relevant times, Defendant Colarossi acted within the scope of his employment or agency with USAG.

32.     Defendant Twistars USA, Inc. d/b/a Geddert's Twistars Gymnastics Club USA was and continues to be an organization incorporated in Michigan.

33.     Defendant John Geddert ("Geddert") was the owner and operator of Defendant Twistars and has been the head coach of Defendant Twistars from its inception in 1996 until January 25, 2018, when ownership and control was transferred to his wife, Kathryn Geddert.

34.     At all relevant times, Defendant Geddert acted within the scope of his employment or agency with Twistars and USAG.

35.     Defendant Debbie Van Horn ("Van Horn") was a medical director with USAG until January, 2018 who worked with Defendant Nassar at the Karolyi Ranch in Texas. Van Horn is subject to a criminal indictment in Texas in connection with the MSU/Nassar Scandal.

36.     At all relevant times, Defendant Van Horn acted within the scope of her employment or agency with USAG.

37.     Defendant United States Olympic Committee (hereinafter "USOC"), at all times mentioned herein, was and is a federally-chartered nonprofit corporation, having its principal place of business in the State of Colorado and is headquartered in Colorado Springs, Colorado. Defendant USOC is authorized to conduct business and conductsbusiness throughout the United States, including the State of Michigan.

## C. Jurisdiction and Venue

38.     This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*, as more fully set forth herein.

39.     This is also an action to secure relief for violations of rights guaranteed by the Patient Protection and Affordable Care Act §1557, 42 U.S.C. §18116 (2012) (Section 1557).

40.     Section 1557 of the Affordable Care Act prohibits discrimination in health care programs or activities, "any party of which is receiving Federal

financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency" or any entity established under Title IX of the Affordable Care Act or its amendments.

41.     This Court has original jurisdiction over Plaintiffs' claims arising under Section 1557.

42.     This is also an action to redress the deprivation of Plaintiffs' constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. §1983.

43.     The claims are cognizable under the Fourteenth Amendment of the United States Constitution, 42 U.S.C. §1983, 20 U.S.C. §1681 *et seq.*, 42 U.S.C. §18116, and under Michigan Law.

44.     Subject matter jurisdiction is founded upon 28 U.S.C. §1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

45.     Subject matter jurisdiction is also founded upon 28 U.S.C. §1343, which gives district courts original jurisdiction over any civil actions authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by

any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

46.     Plaintiffs also bring claims for sex trafficking in violation of TVPRA, 18 U.S.C. §1591, for which the Court has jurisdiction under, among other statutes, 18 U.S.C. §1595.

47.     Plaintiffs further invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a) to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

48.     The events giving rise to this lawsuit occurred in Ingham County, Michigan, which sits in the Southern Division of the Western District of Michigan; therefore, venue is proper in the United States District Court for the Western District of Michigan, pursuant to 28 U.S.C. §1391 (b)(2).

## GENERAL ALLEGATIONS

### A. Defendant Nassar Worked for and under the Aegis of his Co-Defendants

49.     In 1984, Defendant Lawrence Gerard Nassar ("Nassar"), while still an undergraduate, began volunteering as a trainer at Great Lakes Gymnastics in Lansing, Michigan.

50.     In 1986, Nassar began volunteering with Defendant USA Gymnastics ("USAG") as an athletic trainer.

51.     Around the same time, he took on a similar role with the Michigan State University Athletics Department.

52.     In 1993, Nassar received his D.O. degree from MSU.

53.     Between 1993 and 1997, Nassar completed his medical residency at St. Lawrence Hospital in Lansing, Michigan.

54.     In 1996, USAG named Nassar its chief medical coordinator and served as the team doctor for the 1996 United States Olympics Women's Gymnastics Team.

55.     In 1996, Defendant John Geddert ["Twistars"] was fired as a coach of Great Lakes Gymnastics.

56.     As the Great Lakes Gymnastics founder stated to explain firing Geddert, "We started this club 18 years ago with the idea of providing a positive gymnastics environment for everybody. Under John [Geddert] we found ourselves moving farther and farther away from that idea."

57.     Geddert then started his own facility, Defendant Twistars.

58.     Nassar was affiliated with Twistars as a trainer and doctor from its inception.

59.     From approximately 1998 to 2016, Nassar was employed by USAG and the United States Olympic Committee ("USOC") in various positions, including the following positions: (a) Certified Athletic Trainer, (b) Osteopathic Physician, (c) National Medical Director, (d) National Team Physician, USA Gymnastics; and National Team Physician, USA Gymnastics Women's Artistic Gymnastics National Team.

60.     In 1997, Nassar received a faculty appointment to work at MSU in a variety of clinical capacities, including but not limited to:

  a.  Faculty member, MSU Division of Sports Medicine, Department of Radiology, College of Osteopathic Medicine;

  b.  Team Physician, MSU Men's and Women's Gymnastics Teams;

  c.  Team Physician, MSU Men's and Women's Track & Field;

  d.  Medical Consultant, MSU Wharton Center for the Performing Arts; and

  e.  Advisor, Student Osteopathic Association of Sports Medicine.

61.     As a faculty member for the MSU Division of Sport Medicine, Nassar served as a clinician and provided medical services to patients of the MSU Sport Medicine Clinic.

62.     As an MSU employee and agent, Nassar maintained an office at MSU in East Lansing, Michigan, and practiced osteopathic medicine at MSU's Sports Medicine Clinic.

**B. Relationship Between Defendants Twistars, USAG and USOC**

63.     Defendant USAG requires member clubs to pay a fee in order to hold Defendant USAG sanctioned events.

64.     Defendant USAG also issues rules and requirements for its member clubs and exercises some degree of control over its member clubs because Defendant USAG has the authority to revoke a club's membership.

65.     Defendant USAG also requires all coaches, judges, and athletes to pay a membership fee if they want to participate in USAG sanctioned events.

66.     Defendant Twistars is a member club and agent of Defendant USAG.

67.     Defendant Twistars required all gymnasts interested in competing to become members of Defendant USAG and to pay a membership fee to Defendant USAG.

68.     Club membership in Defendant USAG is a substantial benefit for Defendant Twistars and Defendant Geddert, as membership with Defendant USAG and participation in Defendant USAG sanctioned events is an essential factor that interested gymnasts consider in joining a gymnastics club.

69.     John Geddert was at all relevant times and still is the owner and operator of Twistars. Geddert served as the USA World and Olympic Women's Gymnastics Team Head Coach.

70.     Geddert regularly recommended Nassar as a reputable physician to athletes who trained at Twistars.

71.     Twistars displayed at least one photograph of Nassar at its facility for an extended period of time.

72.     Twistars' website states, regarding Defendant Geddert, "Being named Head coach for the USA Olympic and World Championships Gold Medal Winning team, paint the picture of national respect."

73.     USAG received a financial benefit through its relationship with Defendants Twistars and Geddert in the form of membership fees and fame.

74.     Twistars and Geddert received a benefit through its relationship with Defendant USAG in the form of national and global exposure, fame, and increased enrollment.

75.     USOC is a federally chartered nonprofit corporation, which was reorganized by the Ted Stevens Amateur Sports Act, originally enacted in 1978.

76.     As advertised on its website, "[t]he USOC has two primary responsibilities in its oversight of Olympic and Paralympic sport in the United States. The first is to generate resources in support of its mission, which is to

help American athletes achieve sustained competitive excellence. The second is to ensure organizational resource are wisely and effectively used to that end."

77.     Furthermore, "...USOC is committed to creating a safe and positive environment for athletes' physical, emotional and social development and to ensuring that it promotes an environment free of misconduct."

78.     Under the Ted Stevens Amateur Sports Act, 36 U.S.C. §220501, et seq. (hereinafter, "Ted Stevens Act") USOC had a mandatory obligation to ensure that before granting National Governing Bodies ("NGB"), including USAG and USOC, a sanction to host National or International events, that they provide "proper medical supervision will be provided for athletes who will participate in the competition." 36 U.S.C. §220525(b)(4)(E).

79.     The USOC has the power to decertify USAG and all associated clubs, gyms, and teams.  Among other things, decertification would strip USAG of its ability to crown national champions and select Olympic teams.

80.     USAG is the National Governing Body for gymnastics in the United States, as designated and permitted by Defendant USOC under the Ted Stevens Act, and selects and trains the United States gymnastics teams for the Olympics and World Championships, promotes and develops gymnastics locally and

nationally, and serves as a resource center for members, clubs, fans and gymnasts throughout the United States.

81.     USAG has more than 174,000 athletes and professional members, more than 148,000 athletes registered in competitive programs, as well as more than 25,000 professional, instructor and club members.  Approximately 4,000 competitions and events throughout the United States are sanctioned annually by USAG.

82.     The USAG directly certifies and trains coaches for a fee, in part through USA Gymnastics University, an online training platform through which USAG provides courses, course material, and video training.

83.     The USAG collects a fee from gymnasts to be a USAG member and to compete in USAG-sanctioned competitions.

84.     The USAG sanctions gyms where gymnasts practice and compete. For a fee and proposed compliance with just five USAG policies, a gym can become certified to train under the USAG banner.

85.     The USAG sponsors competitions in which members and gyms pay a fee to compete.  These competitions take place throughout the country, and gymnasts of a variety of ages and skill levels compete.  USAG was the primary entity owning, operating and controlling the activities and behavior of its certified, trained, and sanctioned professionals, members, and agents.

86.     For decades, the USAG and the USOC have touted themselves as creating a positive and safe environment, including during the time Plaintiffs were gymnasts.  In fact, USAG touts that "prior to almost all other National Governing Bodies, USA gymnastics has provided awareness, prevention and reporting information regarding sexual misconduct to professional members, member clubs, athlete members and their families."

87.     Moreover, the bylaws of USAG, or similar bylaws previously enacted, were made in conformance with, and under the mandate of, Defendant USOC, and were intended to protect minor gymnasts, including Plaintiffs, from sexual abuse, a known and foreseeable risk posed to minor athletes in amateur sports.

88.     The USOC similarly touts that its policies prevent "…USOC employees, coaches, contracted staff, volunteers, board members, committee and task force members, and other individuals working with athletes or other sport participants while at an OTC, whether or not they are employees of the USOC" and "…[a]thletes training and/or residing at a USOC Olympic Training Center" from engaging in sexually-abusive misconduct, including "child sexual abuse" and "sexual misconduct."  USOC Safe Sport Policies, Section II(c).

89.     USOC also has policies to identify "grooming" behaviors, which it defines as, "…the most common strategy used by offenders to seduce their victims."

90.     Despite their obligations under the Ted Stevens Act and their bylaws, rules, policies and procedures purporting to protect young athletes, USOC and USAG never ensured, audited, or checked to confirm that these policies were properly implemented, enforced, or effective at detecting, preventing, and remedying abuse perpetrated by certified coaches and at sanctioned facilities.

91.     Had USOC and USAG upheld their duties under federal law, the repeated sexual abuse suffered by Plaintiffs and so many others could have been avoided.

92.     In or around 1999, the Karolyi Ranch in Huntsville, Texas became the location of the USAG National Team Training Center. The Karolyi Ranch was owned and operated by Bela Karolyi and Marta Karolyi (collectively referred to herein as the "Karolyis"), who were recruited and hired by USAG to serve as the National Team Coordinator at different times.

93.     As the USAG National Team Coordinator, the Karolyis required attendance at the Karolyi Ranch facility where the USAG team doctor, Defendant Nassar, came into contact with Plaintiffs and other young female athletes. During their employment, agency, and/or representation of the USAG and USOC, the Karolyis operated the Karolyi Ranch in concert, connection and/or coordination with the USAG and USOC.

94.     Van Horn was at all relevant times a USAG Trainer/Medical Director and at times worked with athletes at the Karolyi Ranch.

95.     Van Horn regularly recommended Nassar as a reputable physician to USAG athletes, representing him as a renowned orthopedic sports medicine physician, well respected in the gymnastics community and the team doctor of the United States Gymnastics team.

96.     During all relevant times during Plaintiffs' abuse, USOC and USAG were responsible for ensuring that the Karolyi Ranch and Twistars, provided adequate supervision for the minors competing thereat, reasonable safety protocols ensuring the safety of those minors, and reasonable supervision, training, and oversight procedures for all medical care provided to gymnasts at the Karolyi Ranch and Twistars, including training of staff on identification of sexual abuse, proper procedures, use of proper medical care, and staffing of ample medical personnel to ensure proper care of all minor gymnasts, including Plaintiffs.

97.     Despite these duties under the law, Defendant USOC and USAG implemented virtually no safety protocols or procedures at the Karolyi Ranch and Twistars, and failed to provide any supervision for minor gymnasts training at the Karolyi Ranch and Twistars.

98.    Nassar acted as an agent of Twistars and Karolyi Ranch and regularly provided services or treatment to Twistars' members and to USAG members that trained at the Karolyi Ranch and Twistars' facility.

99.    While employed by MSU, USOC and USAG, Nassar practiced medicine at MSU's Sports Medicine Clinic, at USOC and USAG sanctioned events worldwide, and at Twistars and Karolyi Ranch.

100.    Nassar was promoted as the USOC and USAG team doctor and received patients because of his status as team doctor.

101.    From in or around 1996 until September, 2016, Nassar was a full-time employee of MSU, and a physician in its Sports Medicine Department. During this period, his written and contractually-mandated job duties involved a vast allocation of his time (approximately 50%) being spent conducting what is described by MSU as "outreach."

102.    One of the organizations that he routinely provided outreach for, and that MSU and USOC knew Defendant Nasaar would routinely provide "outreach" for, was USAG, which can be found in Nassar's employment documents.

103.    Thus, the work performed by Nassar for USAG and USOC, was performed within the course and scope of Nassar's employment with MSU, and MSU was responsible with USAG, USOC, (and other defendants), for

supervising Nassar, protecting the Plaintiffs from Nassar, and warning the Plaintiffs' parents of the risks posed by Nassar to the Plaintiffs and other minor girls in USAG, USOC, and MSU's care.

104. As part of Nassar's employment, MSU explicitly allowed and encouraged Nassar to travel across the country with USAG, USOC, and travel to Texas to perform work for Karolyi Ranch and in Michigan at Twistars.

105. Plaintiffs are informed and believe, and on that basis allege that Defendants, at all times relevant to Plaintiffs' abuse, knew that Nassar was performing purported medical treatments on minor children including the Plaintiffs, knew that Defendant Nassar had complaints pertaining to these purported medical treatments (which were disguised, sexually abusive acts), but nonetheless allowed Nassar to continue working for MSU, USAG and USOC, and at Twistars and Karolyi Ranch, without any prior warning, protection, or remedial steps taken to limit his access to minor children.

106. For over 20 years, Nassar had unrestricted and unmonitored access to young female athletes through the Sports Medicine Clinic at MSU, USAG and USOC sanctioned events, the Karolyi Ranch and Twistars, who all regularly and routinely referred young female athletes to his care.

## C. Defendant Nassar's "Treatments" Violated Occupational Health Standards and Were Inconsistent with his Training

107.   As a physician of osteopathic medicine, Nassar's medical care and treatment should have consisted largely of osteopathic adjustments and kinesiology treatment of patients.

108.   During his employment, agency and representation with MSU, Twistars, USAG and USOC, Nassar sexually assaulted, abused and molested multiple girls and women, including Plaintiffs, by engaging in nonconsensual sexual touching, assault, and harassment, including but not limited to ungloved, digital vaginal penetration.

109.   The State of Michigan's Department of Licensing and Regulatory Affairs Occupational Health Standards regarding Bloodborne Infectious Diseases mandates use of gloves when exposed to potentially infectious material, including vaginal secretions.

110.   Nassar is not and has never been a medical doctor of obstetrics or gynecology ("OB/GYN").

111.   Nassar is not and has never been trained or certified as a pelvic floor therapist.

22

## D. Defendant MSU's Sports Medicine Clinic Engages in Proprietary Functions

112.  The Sports Medicine Clinic is a MSU facility that is subject to the control, operation and governance of MSU and the MSU Trustees.

113.  For over 20 years, MSU's Sports Medicine Clinic has provided health care to people, including members of the public who were otherwise not affiliated with MSU, including Plaintiffs.

114.  When the MSU Defendants operated the MSU Sports Medicine Clinic and provided medical services to Plaintiffs and others, they were acting as an arm of the State.

115.  The MSU Sports Medicine Clinic charged patients, including Plaintiffs, for their receipt of medical services.

116.  Charging Plaintiffs (and others) and billing insurance companies for medical services is an activity proprietary in nature, and created a fiduciary and special relationship between Plaintiffs and the MSU Defendants.

117.  The MSU Defendants charged fees comparable to specialists for the services provided at the MSU Sports Medicine Clinic.

118.  The MSU Sports Medicine Clinic engaged in proprietary functions by entering into the business of providing medical services for the primary purpose of raising funds and making a profit for the MSU Defendants.

119.   The MSU Sports Medicine Clinic cannot be normally supported by taxes and fees.

120.   By seeking medical treatment and services from Defendant MSU's Sports Medicine Clinic and from Defendant Nassar while in the course of their employment agency, and/or representation with MSU, Plaintiffs had a special, confidential and fiduciary relationship with MSU, and Defendants Nassar, Dietzel, and Kovan.

**E. MSU Defendants Dismissed Early Reports of Abuse, thereby Allowing Nassar to Continue Abusing and Sexually Assaulting Patients and Athletes Entrusted to his Care for Nineteen More Years.**

121.   In late 1997 to mid-1998, a 16 or 17-year-old gymnast Larissa Boyce was injured at a Michigan State youth gymnastics program and informed coach Kathie Klages that Nassar sexual abused her during his treatment of her injuries.

122.   Boyce informed Klages that Nassar had digitally penetrated her vagina during the treatment.

123.   Klages responded "that [Boyce] must be misunderstanding what was going on."

124.   Klages discouraged Boyce from filing a complaint because it would have serious consequences for her and Nassar.

125.   Klages informed Nassar of the conversation and at Boyce's next appointment, Nassar told Boyce that she "was not understanding a proper medical treatment."

126.   After this incident, Klages asked another young gymnast if Nassar had performed the procedure that involved digital vaginal and anal penetration and she responded that he had.

127.   Klages told this woman not to further raise the subject or report Nassar's conduct.

128.   In 1999, Christie Achenbach, a member of the MSU women's cross country team, reported to MSU Track & Field Head Coach Kelli Bert and multiple team trainers, that Nassar sexually assaulted her during a treatment for a sore hamstring.

129.   Bert and the trainers told Achenbach that "she must be wrong."

130.   Bert and the trainers told Achenbach that she was lucky to be treated by Nassar because he's an Olympic doctor and "knew what he was doing."

131.   In 2000, after Nassar sexually assaulted her during a "treatment," MSU Softball team member Tiffany Thomas Lopez informed three MSU trainers that Nassar was sexually inappropriate during medical treatments.

132.   One of these trainers was Lianna Hadden, who began working at MSU in 2000 and continues to serve as an athletic trainer there.

133.   Another was Destiny Teachnor-Hauk, who began working as an athletic trainer at MSU in 1997 and also continues to work as a trainer for MSU athletics.

134.   These trainers dismissed Lopez's concerns and told her she should feel lucky to be treated by a world-renowned doctor.

135.   Lopez informed the trainers that the penetration did not provide relief, but nonetheless they encouraged her not to file a complaint.

136.   In 2001 or 2002, Jennifer Rood Bedford, an MSU Volleyball team member, was sexual assaulted by Nassar and reported the conduct to MSU trainers, including Lianna Hadden.

137.   Bedford states that she and her teammates openly referred to Nassar as the "crotch doc" because of the "treatment" he used that included vaginal penetration.

138.   The trainers to whom Bedford reported the assault, including Lianna Hadden, dissuaded her from filing a complaint against Nassar.

139.   In 2004, Dr. Jeffrey Kovan referred a patient to Dr. Nassar for treatment, knowing that Nassar would employ digital penetration of her vagina.

140.   Also in 2004, Kyle Stephens, an 11 or 12-year-old girl, told Defendant Gary Stollak, a clinical psychologist at MSU, that Nassar had been abusing her and sexually assaulting her since age six.

141. Stollak did not report the abuse to law enforcement, MSU, or child protective services.

142. Instead, Stollak suggested that she and her parents meet with Nassar.

143. Stollak and the child's parents met with Nassar and Nassar prevailed upon them to drop the matter.

144. Stephens complained to other counselors later on, but no reports were made.

145. From approximately 2008 to 2009, a woman who worked for the MSU College of Osteopathic Medicine as a simulated patient informed the MSU manager of medical demonstrations, Rebecca Cass, that she refused to serve as a simulated patient for Nassar due to his inappropriate comments and touching of her during a demonstration examination to medical students.

146. MSU maintained no record of this simulated patient's complaint.

147. Pursuant to Michigan State University's Office of Institutional Equity policy, MSU's personnel, with knowledge of Nassar's abuse, had a duty to take further action, including:

    a. "to promptly take steps to investigate or otherwise determine what occurred and then to address instances of relationship violence and sexual misconduct when it knows or should have known about such instances;"

b. to inform "the MSU Police of all reports it receives regarding sexual assaults;"

c. to "take immediate steps to initiate the investigatory process to determine what happened and to resolve the matter promptly and equitably;"

d. to "take prompt, responsive action to support a claimant and … take steps to eliminate, prevent, or address a hostile environment if it determines that one exists;"

e. "to conduct a prompt, adequate, reliable, and impartial investigation to determine what occurred and then to take appropriate steps to resolve the situation when it learns of an incident of sexual misconduct;

f. "independently investigate complaints of relationship violence and sexual misconduct;"

g. to conduct an investigation "by the Office of Institutional Equity under the direction of the Deputy Title IX Coordinator for Investigations;" and ,

h. to promptly report allegations of sexual misconduct "to the Office of Institutional Equity."

148.   Despite knowledge of sexual abuse, and in violation of state and federal law, MSU failed to take any action in response to the above-mentioned complaints.

149.   Because MSU took no action to investigate the above complaints and took no meaningful corrective action, from 1997 on, under the guise of treatment, multiple girls and women, including Plaintiffs, were sexually assaulted, abused and molested by Nassar, including by nonconsensual vaginal digital penetration, nonconsensual sexual touching of the vaginal and anal area without the use of gloves or lubricant, and nonconsensual touching and groping of the breasts.

150.   Nassar's victims during this period ranged from adults to children as young as eight years old.

**F. Defendants Geddert and Twistars Ignored Complaints of Abuse and Continued to Refer Athletes to Nassar, Even Conditioning their Coaching on Submission to Nassar's "Treatments."**

151.   In 1997, a parent of a young gymnast being coached by Geddert complained to Geddert about Nassar's sexual assault of the child during a treatment.

152.   Instead of investigating this abuse and acting to stop it, Geddert ignored the complaint and continued to encourage his gymnasts and their parents to rely on Nassar for treatment.

153.   Indeed, Geddert made treatment with Nassar compulsory for gymnasts who wished to train with him, resulting in Nassar's continued abuse and sexual assaults of athletes coached by Geddert and others at Twistar for nineteen more years after this child's parents brought the abuse to his attention.

154.   In 2010, a 15-year-old gymnast at Twistars was assaulted by Nassar with Geddert in the room watching and knowing that Nassar was digitally penetrating her vagina.

155.   Geddert even joked to the gymnast while watching the procedure that "I guess your back really did hurt."

156.   Geddert took no action to stop the assault, protect the gymnast, report Nassar to authorities, or otherwise prevent any future occurrences.

157.   John Geddert served as head coach of the 2011 USA World Championship Team and the 2012 USA Olympics Team.

158.   In 2011, while in the presence of members of the 2012 U.S.A. Olympics Team, Geddert heard members discuss "in graphic detail what Nassar had done to her the night before" during a purported "treatment" session.

159.   Geddert took no action in response to hearing this conversation to report Nassar to authorities or otherwise prevent any future sexual assaults.

**G. MSU Investigates Nassar, Finds Concerns, But Fails to Implement Safeguards.**

160. In April of 2014, Amanda Thomashow filed a complaint with the MSU Police alleging abuse during medical treatment.

161. Thomashow claimed that Nassar massaged her breast and buttocks on an intimate way, then massaged her vaginal area and did not stop when she told him it hurt.

162. Thomashow also reported that Nassar was sexually aroused during the treatment.

163. MSU opened a Title IX investigation and referred the matter to the Ingham County Prosecutor's office.

164. Stuart Dunnings, who was prosecutor at time and since resigned in March 2016 for his own sexual misconduct, was swayed to drop the case after seeing a video demonstrating the procedure's "legitimacy."

165. Strampel initially suspended Nassar during this investigation.

166. However, on June 30, 2014, Strampel gave Nassar permission to return to seeing patients, even though the internal investigation had not yet concluded.

167. MSU investigator Kristine Moore consulted with four "experts" in the course of her investigation into Nassar.

31

168.   The "experts" Moore consulted were all closely tied to Nassar and supported him in the investigation.

169.   Brooke Lemmen, D.O., was a colleague of Nassar's at the MSU Sports Medicine Clinic and resigned from MSU in mid-January of 2017 in part for pressuring a staff person not to fully cooperate with the internal investigation.

170.   Destiny Teachnor-Hauk, who had worked with Nassar for seventeen years as a MSU athletic trainer, told Moore that she had never had a complaint about Nassar's techniques, even though she had.

171.   Lisa DeStefano, D.O., was chair of the MSU Osteopathic Manipulative Medicine Department and had been a medical school classmate with Nassar and colleague.

172.   Jennifer Gilmore, D.O., who had known Nassar since they were both residents in 1995, and Nassar served as her attending physician during her sport medicine fellowship.

173.   On July 28, 2014, the MSU Office of Institutional Equity issued two reports, one shared with the complainant Amanda Thomashow and one shared internally at MSU, including with Nassar and Strampel.

174.   Both versions of the July 28, 2014 report stated that the investigation "cannot find that the conduct was of a sexual nature. Thus, it did not violate the

Sexual Harassment Policy. However, we find the claim helpful in that it allows us to examine certain practices at the MSU Sports Medicine Clinic."

175.   The version of the report that investigator Kristine Moore produced for MSU that was not provided to Amanda Thomashow contained the following conclusion:

> We cannot find that the conduct was of a sexual nature. Thus, it did not violate the Sexual Harassment Policy. However, we find the claim helpful in that it brought to light some significant problems that the practice will want to address.
>
> We find that whether medically sound or not, the failure to adequately explain procedures such as these invasive, sensitive procedures is opening the practice up to liability and is exposing patients to unnecessary trauma based on the possibility of perceived inappropriate sexual misconduct. In addition, we find that the failure to obtain consent from patients prior to the procedure is likewise exposing the practice to liability. If procedures can be performed skin-on-skin or over clothes in the breast or pelvic floor area, it would seem patients should have the choice between the two. Having a resident, nurse or someone in room during a sensitive procedure protects doctors and provides patients with peace of mind. If "touching is what DOs do" and that is not commonly known, perhaps the practice will want to consider a disclaimer or information sheet with that information provided to the patient up front.
>
> Finally, we believe the practice should consider whether its procedure for intake of complaints about physicians' behavior is adequate. Ms. Thomashow claims she tried to file a complaint with the front desk receptionist, telling her that she was cancelling her appointment because she felt "violated." Whether this triggers a reporting protocol should be examined by the practice.

176. MSU dismissed Thomashow's complaint, stating that she didn't understand the "nuanced difference" between sexual assault and an appropriate medical procedure. MSU determined that Nassar's conduct was "medically appropriate" and "[n]ot of a sexual nature."

177. Amanda Thomashow reported to MSU that its investigation report by Kristine Moore omitted or withheld the following facts:

    a. Nassar was sexually aroused when he assaulted her; and

    b. Nassar did not end the assault until Thomashow forcibly removed his hand from her.

178. As a result of this investigation, MSU claimed that it established protocols for intravaginal procedures for Nassar – *inter alia* having a third party in the room, minimizing skin-to-skin contact, and explaining the treatments in detail.

179. On July 30, 2014, Strampel emailed Nassar confirming new institutional protocols in writing:

    a. having another person (resident, nurse, etc.) in the room whenever approaching a patient to perform procedures close to a sensitive area;

    b. the procedure that led to the complaint would be modified to be sure that there is little to no skin-to-skin contact when in "these regions." Should the procedure be absolutely necessary, the procedure would be

explained in detail with another person in the room for both the
explanation and the procedure; and

c. new people in the practice will be oriented to be sure they understand
these requirements.

180.   At approximately the same time, Strampel sent the same email to
MSU's Title IX office indicating that he would enforce these protocols on
Nassar.

181.   Strampel also sent a copy of this email to Dietzel, who along with
Kovan, acted in a supervisory role to Nassar.

182.   However, Strampel did not enforce these protocols and he did not
alert other Clinic employees about their existence and applicability to Nassar.

183.   Strampel admitted to Detective Sergeant Christopher Rozman of the
MSU Police on March 14, 2017, that the institutional restrictions and guidelines
for Nassar were not shared beyond Dietzel and that Strampel took no action to
ensure that they were implemented, followed, or enforced.

184.   Strampel further admitted to Det. Sgt. Rozman that he did not wish for
other employees of the Sports Medicine Clinic to know of the accusations
against Nassar or that Nassar was subject to restrictions or guidelines.

185. Strampel further admitted to Det. Sgt. Rozman that he took no steps to orient or instruct any MSU employees regarding the restrictions or guidelines outlined in the July 30, 2014 email.

186. In 2016, a registered nurse who was the only registered nurse at the MSU Sports Medicine Clinic at the time also stated that she was never made aware of any restrictions or guidelines regarding Nassar.

187. On August 30, 2016, MSU suspended Nassar from clinical and patient duties upon receipt of a criminal complaint.

188. In September of 2016, MSU finally terminated Nassar's employment in the wake of criminal investigations regarding his sexual assault of minors and possession of child pornography.

189. The reasons given for Nassar's termination included but were not limited to:

    a. deviation from "required best practices put in place following the internal sexual harassment investigation conducted ... in 2014;"

    b. failure to disclose a 2004 complaint to Meridian Township Police; and,

    c. dishonesty by Defendant Nassar when Defendant MSU questioned him about receiving prior complaints about the "procedure" at issue.

190.   Shortly after Nassar was fired, Defendant Klages requested MSU Women's Gymnastics Team members to sign a card to show their support for Nassar.

191.   At the time Klages had her team members sign this card she knew that Nassar had been terminated because of numerous claims of sexual assault against patients and athletes.

192.   Despite terminating Nassar's employment in September of 2016 for sexual assault of patients and athletes, MSU did not encourage members of the Women's Gymnastics Team to report suspected abuse until February of 2017.

193.   On March 15, 2017, Teachnor-Hauk made statements to MSU Police Department Detective Lieutenant Andrea Munford, Det. Sgt. Rozman, and FBI Special Agent Rodney Charles that she had never had an athlete tell her that Nassar made them uncomfortable or that Nassar had performed digital vaginal penetration.

194.   Teachnor-Hauk's statement was false because numerous athletes had reported their discomfort with Nassar and that he had performed digital vaginal penetration on them, including a report in 1999-2000.

195.   On January 24, 2018, Simon resigned as President of MSU.

196.   On January 26, 2018, Hollis resigned as Athletic Director of MSU.

197.   On February 9, 2018, MSU initiated steps to revoke Strampel's tenure and terminate his employment, stating "Strampel did not act with the level of professionalism we expect from individuals who hold senior leadership positions, particularly in a position that involves student and patient safety . . . . Further allegations have arisen that question whether his person conduct over a long period of time met MSU's standards."

## H. MSU Failings with Regard to Title IX Compliance.

198.   On June 9, 2011, the Office of Civil Rights for the U.S. Department of Education ("OCR") received its first complaint from a student at MSU of failing to respond properly to a report of sexual assault.

199.   On January 29, 2014, the OCR received a second complaint from a student at MSU complaining of the university's failure to respond appropriately to reports and incidents of sexual violence.

200.   On August 28, 2015, after a lengthy investigation, MSU and the OCR, entered into a Resolution Agreement to resolve complaints and repair shortcomings identified in MSU's compliance with Title IX laws and regulations. The steps MSU agreed to take included:

a.   Improving its public nondiscrimination and anti-harassment statements;

b. Significantly revising its policies and grievance procedures to provide better guidance, more prominently identify and make accessible the Title IX office, and ensure prompt and adequate investigations;

c. Adopting more robust documentation and reporting of its Title IX incidents;

d. Developing closer ties with local law enforcement agencies for response to criminal complaints;

e. Improving its training of faculty and staff on Title IX policies and grievance procedures;

f. Increasing the staffing of the Title IX office;

g. Providing improved information and training materials for students and student athletes;

h. Creating an advisory committee to address issues of sexual violence; and,

i. Conduct periodic assessment of the campus climate regarding sexual violence and harassment.

201. On September 1, 2015, the OCR issued a letter finding significant deficiencies in MSU's compliance with the dictates of Title IX. These deficiencies included:

a. MSU's notice of nondiscrimination failed to indicate where to refer inquiries and its grievance procedures failed to comply with Title IX requirements;

b. A "sexually hostile environment existed for and affected numerous students and staff" at MSU, and MSU's "failure to address complaints of sexual harassment, including sexual violence, in a prompt and equitable manner caused and may have contributed to a continuation of this sexually hostile environment;"

c. That several instances of the university's failure to respond appropriately "might have led the complainant or others to continue to be subjected to a sexually hostile environment;"

d. MSU's investigative files were incomplete;

e. In two cases, MSU's documentation supported a finding that a sexually hostile environment existed, but the University failed to find that harassment had occurred; and,

f. MSU failed to provide two students with prompt and equitable responses to their complaints.

202. The OCR further found that MSU lacked memoranda of understanding with the local police departments to facilitate investigations and

response to criminal complaints and had insufficient training and information dissemination to its faculty, staff, and students.

## I. USAG Fostered a Culture that Allowed Rampant Abuse by Coaches, Nassar.

203.   USAG advertises on its website: "Since 1990—prior to almost all other National Governing Bodies—USA Gymnastics has provided awareness, prevention and reporting information regarding sexual misconduct to professional members, athlete members and their families."

204.   Notwithstanding USAG's promise to protect its members, by 2013, the USAG possessed files at its headquarters with dossiers of complaints of abuse on over fifty coaches.

205.   The existence of these dossiers became known after they were produced in Lisa Gansler's lawsuit in 2013 on behalf of her minor daughter against USAG coach William McCabe.

206.   On August 4, 2016, the IndyStar reported that the USAG had reports about McCabe molesting underage girls by 1998, but allowed him to continue coaching for seven more years.

207.   USAG only took action to remove McCabe from coaching after Gansler's mother brought her concerns to the FBI about his assault of her eleven year old daughter.

208. McCabe pleaded guilty in 2006 to charges of child sexual assault and is serving a thirty year sentence.

209. According to the USAG, it began receiving allegations of "athlete concerns" in the summer of 2015 and relieved Nassar of his duties that summer.

210. However, USAG did not publicly announce that it severed its affiliation with Nassar until September of 2016, after news of Nassar's crimes became public.

211. USAG, according to recent media reports, reported Nassar to the FBI but did not inform MSU of its concerns or that it had notified the FBI.

212. USAG also did not inform Twistars or Geddert of the concerns that led to relieving Nassar of his duties with USAG, even though Twistars is a USAG member club and Geddert is a USAG member coach.

213. Nassar did not inform MSU or other supportive agencies or persons that he had been banned from USAG.

214. On August 4, 2016, Rachel Denhollander wrote to the IndyStar in response to its "Out of Balance" investigation of sexual abuse of women gymnasts by coaches to describe her abuse experience by Nassar.

215. On August 15, 2016, Jamie Dantzscher's attorney contacted IndyStar to report his client's similar experience.

216. A few days later, Jessica Howard called IndyStar to report that Nassar had abused her beginning when she was fifteen.

217. In December of 2016, USAG settled claims brought by Olympic gold-medal gymnast McKayla Maroney against it involving allegations of sexual abuse by Nassar.

218. At this time, USAG also entered into one or more civil settlement agreements in California involving claims of child sex abuse or other acts by Nassar that could have been prosecuted as felony sex offenses.

219. In June of 2017, the USAG adopted a new "Safe Sport Policy" that:

    a. increases the number of individuals who fall under USA Gymnastics jurisdiction; essentially increasing the number of people in our sport who are accountable for their behavior;

    b. increases the categories of misconduct from two (sexual and physical misconduct) to six (verbal/emotional misconduct, bullying, hazing and harassment were added);

    c. addresses and prohibits boundary violations and grooming behaviors;

    d. requires covered individuals to report a suspicion of abuse to law enforcement, even if they are not a mandated reporter according to their state law;

e.  requires covered individuals to notify USA Gymnastics or the U.S.

Center for SafeSport for any misconduct; and

f.  requires covered individuals to take a designated safe sport course

every two years.

220.  On January 22, 2018, USAG suspended Geddert without explanation.

221.  By January 31, 2018, the entire board of directors of the USAG

resigned under threat of decertification by the U.S. Olympic Committee.

**J. Nassar and Others Promote Nassar as an Eminent Practitioner, even as They Know of his Abuse and Sexual Assaults.**

222.  In 2004, Brianne Randall-Gay, a 16-year-old patient of Nassar,

reported Nassar's assaults of her to her parents and to the Meridian Township

Police.

223.  The Meridian Township Police closed this case without seeking

criminal charges or notifying MSU.

224.  Nassar did not notify MSU of this investigation.

225.  In 2004, Nassar authored a chapter in "Principles of Manual Sports

Medicine," ed. By Steven J. Karageanes.

226.  In this chapter, Nassar described the pelvic diaphragm, coccyx, and

sacroiliac ligaments as an area of the body not fully examined due to its

proximity to the genitalia and buttocks, and stated it was "referred to as the 'no

fly zone' because of the many cultural stigmas in touching this area."

44

227.   In this chapter, Nassar further wrote that clinicians should take "special measures to explain any examination and techniques applied in this region," and "warning in advance of what you are planning to do," among other suggestions.

228.   Nassar's chapter makes no mention of intravaginal or intra-rectal techniques or procedures.

229.   Nassar did not follow his own recommended best practices in treatments to the pelvic area, as he:

a.   did not explain any intravaginal or intra-rectal techniques to Plaintiffs or their parents;

b.   did not warn Plaintiffs that he was going to engage in vaginal or anal digital penetration before doing so; and

c.   did not seek consent from Plaintiffs or their parents before engaging in vaginal or anal digital penetration.

230.   In 2014, USAG President Steve Penny praised Nassar in an USAG news release, saying he was "instrumental to the success of USA Gymnastics at many levels, both on and off the field of play." Penny added that Nassar's "contributions over the years are immeasurable and will continue to be so."

231.   In 2015, Nassar shared with MSU colleague Brooke Lemmen that the USAG had received complaints about him.

232.    Lemmen did not share her knowledge of the complaints about Nassar with others at MSU.

233.    On September 12, 2014, Geddert stated for publication in a story published by the IndyStar reporting on Nassar's sexual abuse of his patients:

> "He's an extremely professional physician," John Geddert, the 2012 Olympic team head coach and owner of Twistars Gymnastics, told IndyStar. "Very competent and goes above and beyond the call of duty in treating athletes. He's probably one of the most respected gymnastics professionals I've ever had to deal with."

## K. Nassar is Finally Stopped by Criminal Complaints and Proceedings.

234.    In mid-August of 2016, Rachel Denhollander filed a criminal complaint with MSU Police, alleging Nassar sexually assaulted her when she was a 15-year old club-level gymnast in 2000.

235.    On September 8, 2016, Jane JD Doe filed a lawsuit in the Sacramento, CA Superior Court against Nassar and USAG.

236.    On September 25, 2016, IndyStar reported that sixteen more women had filed criminal complaints.

237.    On November 22, 2016, Nasser is charged in Ingham County, Michigan with three first-degree sexual assault charges related to abuse of a person under 13.

238.    On December 16, 2016, Nassar was indicted on federal child pornography charges in W.D. Mich.

239.   On December 21, 2016, an FBI agent testified that Defendant Nassar had at one point used a GoPro camera to record video images of children in a swimming pool and that:

    a.   Defendant Nassar's hand can be seen grabbing one girl's hand and shoving it into the vaginal area of another girl; and,

    b.   Defendant Nassar's thumb can be seen pressing into a child's vagina/vaginal area.

240.   On February 7, 2017, a superseding indictment in the Federal case against Nassar added an additional count of "Destruction and Concealment of Records and Tangible Objects" alleging between September 19, 2016 and September 20, 2016, Defendant Nassar "caused a third-party vendor to permanently delete and destroy all images, records, documents, and files contained on the hard drive of a laptop computer, and the defendant threw in the trash a number of external hard drives."

241.   On July 11, 2017, Nassar pleaded guilty to three counts:

    a.   Receipt and Attempted Receipt of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A);

    b.   Possession of Child Pornography, in violation of 18 U.S.C. § 48 2252A(a)(5)(B); and

c. Destruction and Concealment of Records and Tangible Objects, in violation of 18 U.S.C. § 1519.

242.   On December 7, 2017, Nassar was sentenced in federal court to three consecutive 20-year sentences.

243.   On February 17, 2017, Nassar was ordered to stand trial in Ingham County on three counts of first-degree criminal sexual conduct with a person under 13.

244.   On February 22, 2017, Nassar was arraigned in Ingham County, Michigan and Eaton County Michigan on 22 counts of first-degree sexual conduct with a person under 13 years old and 14 counts of third-degree criminal sexual assault with a person under the age of 13 years old.

245.   On November 11, 2017, Nassar pleaded guilty to seven counts of criminal sexual assault in Ingham County,

246.   In November of 2017, Nassar pleaded guilty to three counts of criminal sexual assault in Eaton County.

247.   On January 24, 2018, Nassar was sentenced in Ingham County Court to 40-175 years.

248.   On February 5, 2018, Nassar was sentenced in Eaton County Circuit Court to serve 40-125 years.

249. Between the Ingham and Eaton County hearings, approximately 204 victims gave victim impact statements over nine days.

**L. Criminal and Administrative Actions have been initiated against Strampel and Klages.**

250. On March 27, 2018, the Michigan Attorney General filed charges against Strampel in the Ingham County Circuit Court:

    a. one felony count of Misconduct by a Public Official;

    b. one high-misdemeanor count of Criminal Sexual Conduct in the 4th Degree; and,

    c. two misdemeanor counts of Willful Neglect of Duty by a Public Officer.

251. On May 16, 2018, the Michigan Attorney General filed an administrative complaint with the State Department of Licensing and Regulatory Affairs against William Strampel alleging that he violated the Public Health Code while serving as Dean of the College of Osteopathic Medicine.

252. The administrative charges alleged against Strampel allege that:

    a. Strampel used his position of authority to harass, discriminate, demean, sexually proposition, and sexually assault female students; and,

b.  Strampel also abused his authority, through threats and manipulation
to solicit, receive, and possess pornographic images of women who
appeared to be MSU students.

253.  On February 2, 2018, pursuant to a search warrant, the Department of
Attorney General's Special Agent Investigators seized a computer from
Strampel's office on campus, and forensic examination of that computer
uncovered approximately fifty photos of nude or partially nude women, sex
toys and pornography. Many of these photos appeared to be female MSU
students and appeared to be taken by the women in the photos.

254.  The forensic examination of Strampel's computer revealed a video of
Nassar performing a vaginal procedure on a young female patient.

255.  Strampel failed to enforce protocols intended to protect female
patients after the 2014 investigation of Nassar.

256.  The Attorney General's charges to LARA also allege that Strampel
stated in 2016, after he fired Nassar:

a.  that "patients lie to get doctors in trouble,"

b.  that he did not believe the accusations against Nassar, and

c.  that he did not wish to fire Nassar.

257.   On August 23, 2018, Kathie Klages was charged with two counts of lying to law enforcement officers about her prior knowledge over twenty years of Nassar's abuse of gymnasts.

258.   Specifically, when Klages spoke to Michigan State Police detectives, she denied having received any complaints or reports of Nassar's sexual abuse of patients prior to 2016.

## FRAUDULENT CONCEALMENT ALLEGATIONS

259.   MSU officials, employees and other representatives, including Defendants, knew, or should have known that Nassar was sexually assaulting patients and athletes under the guise of legitimate medical treatment since at least 1997.

260.   Since at least 1997, Defendants Twistars, Geddert, USAG, Penny, Van Buren and USOC and their employees and representatives knew or should have known that Nassar's "treatments" of the gymnasts in Geddert's and others' care involved sexual assaults.

261.   Defendants were in a special relationship with Plaintiffs through the provision of training and treatment by Nassar under their aegis.

262.   Defendants also owed a heightened duty of care to Plaintiffs who were minors at the time they received treatment services because their

parents/guardians were obligated to entrust Plaintiffs to the Defendants' care for medical treatment and training.

263. Therefore, each of the Defendants stood in an in *loco parentis* relationship with Plaintiffs.

264. Given this special relationship, Defendants had a duty to disclose and to warn and protect the athletes and patients who sought treatment at its facility and with a doctor/trainer provided by Defendants.

265. Defendants and their employees and other representatives concealed this information from those at MSU or in the public at large, which had the ability to investigate, sanction, prevent, and/or otherwise prosecute Nassar's misconduct.

266. In doing so, they continued to perpetuate the image of Nassar as a world-renowned and highly respected sports physician, who was an asset to the MSU community due to his status.

267. Such statements and representations were false, and those who made, perpetuated, and/or affirmed them, including the MSU Defendants, knew or should have known they were false, but continued to perpetuate them to preserve the comfortable status quo and/or otherwise for their own purposes.

268. Nassar, as well, through the false construct of his reputation and status as an authority figure, fraudulently represented to his patients that his sexual

52

assaults were part of a legitimate course of medical treatment. He knew these statements and representations were false when he made them.

269.  All such statements described herein were made with the intent that Plaintiffs and others rely on them for the proposition that Nassar was a renowned doctor performing legitimate medical procedures, and those who could not tell the "nuanced difference" between legitimate medicine and rape or sexual abuse were mistaken, confused or deluded.

270.  Plaintiff and others reasonably relied on these representations.

271.  Defendants' actions constituted fraudulent concealment of Plaintiffs' causes of action against them.

272.  Such fraudulent concealment reasonably prevented Plaintiffs from knowing that they had a cause of action against Nassar, MSU and possibly other defendants, until the news broke of Nassar's misconduct and MSU's decades-long cover-up, after which Plaintiffs acted promptly to cooperate with authorities and make her respective report.

273.  Plaintiffs are otherwise free from fault, have not contributed to their own injuries, and have at all times made good faith efforts to mitigate their own considerable damages.

274. Further discovery will reveal additional acts and omissions by Defendants, which will prove Defendants' pattern and practice of fraudulent concealment.

## FACTUAL ALLEGATIONS SPECIFIC TO A.G. DOE

275. A.G. DOE was a top-ranked high school gymnast until she was involved in a car wreck and was injured. She subsequently injured her back during gymnastics.

276. A.G. DOE was referred to Nassar and the MSU Sports Medicine Clinic by her pediatrician for bulged discs in her back.

277. For a period of six months in 2001, A.G. DOE was treated by Nassar at his office at MSU Sports Medicine Clinic approximately 15 to 20 times where he provided medical care and treatment.

278. As such, Plaintiff was a business invitee at the MSU Sports Medicine Clinic where she expected to receive medical care and treatment by Nassar, free of harm.

279. Although MSU had prior notice of abuse allegations, it failed to warn Plaintiff of the known or foreseeable dangers regarding complaints related to Nassar.

280. When A.G. DOE began consultations with Nassar, she was checked in by clinic staff and paid insurance co-pays.

281. On later occasions, however, A.G. DOE was not checked in by clinic staff. Nassar instead instructed her to enter through the back door and not to sign in so that she "could avoid co-pays."

282. During the first three appointments A.G. DOE had with Nassar, her mother was present.

283. Nassar began his sexual assaults on A.G. DOE during those appointments by performing what he called "treatments."

284. During these "treatments", Nassar would digitally penetrate A.G. DOE vaginally with his fingers.

285. Nassar would also fondle A.G. DOE's breasts.

286. Nassar did not explain his conduct disguised as "treatment" as a medical procedure to Plaintiff.

287. Nassar did not give prior notice or obtain consent for digital penetration or to touch Plaintiff's genitals.

288. When A.G. DOE visited Nassar for the first time by herself, after she turned sixteen and was old enough to drive, the sexual assaults worsened in extent and frequency.

289. The appointments were often scheduled near the end of the business day when she and Nassar were left in the building by themselves.

290. The "treatment" involved prolonged and intense manipulation of Plaintiff's vaginal area, including digital penetration into her vagina with his finger and thumb without prior notice and without gloves or lubricant under the guise of performing "treatment."

291. During these "treatments" Nassar inserted his fingers – without gloves - into her vagina on more than ten occasions and into her anus twice.

292. Nassar told A.G. DOE that the reason he was doing this was to correct "misalignment of a pubic bone."

293. Nassar, by characterizing his activities as "medical treatment", convinced Plaintiff that his sexual assault of her were in fact appropriate and necessary to achieve a cure for her medical problems.

294. Nassar only wrote things down when A.G. DOE's mother was present at the appointments.

295. At the conclusion of many of the appointments Nassar would give A.G. DOE gifts such as a backpack, water bottle, or t-shirt.

296. On the third occasion when Nassar tried to penetrate A.G. DOE anally she refused. He subsequently refused to see her.

297. Plaintiff A.G. DOE did not treat or intend to treat with Nassar for issues related to obstetrics or gynecology (hereinafter "OB/GYN").

298. Plaintiff A.G. DOE believes the conduct by Nassar was sexual assault, abuse, and molestation and for Nassar's pleasure and self-gratification.

299. A.G. DOE has suffered extreme emotional distress and turmoil in the years since and as a direct and proximate result of these assaults.

300. As a result of the assaults, Plaintiff A.G. DOE, suffered traumatically induced anal and vaginal bleeding, pain and bruising, and has struggled with feelings of embarrassment, disgust, humiliation, deep sadness, and has attempted suicide on numerous occasions.

## FACTUAL ALLEGATIONS SPECIFIC TO A.W. DOE

301. From a young age, Plaintiff A.W. DOE was taught to strictly obey authority, including doctors, without question and without complaint, regardless of the severity of pain, abuse and discomfortshe experienced.

302. Plaintiff A.W. DOE treated with Nassar at his office at MSU Sports Medicine Clinic in 2001 and 2002 where he provided medical care and treatment.

303. As such, Plaintiff was a business invitee at the MSU Sports Medicine Clinic where she expected to receive medical care and treatment by Nassar, free of harm.

304.   Although MSU had prior notice of abuse allegations, it failed to warn Plaintiff of the known or foreseeable dangers regarding complaints related to Nassar.

305.   In 2001, Plaintiff A.W. DOE was a sixteen year old child in her junior year of high school.

306.   A.W. DOE began her participation in gymnastic programs around the age of 11.

307.   Upon entering Mason High School, A.W. DOE joined the varsity gymnastics team on which she competed for four years.

308.   During her junior year of high school A.W. DOE was injured during a gymnastics meet so severely that she was unable to walk.

309.   Following the injury, A.W. DOE was referred to Nassar by her gymnastics coach.

310.   When A.W. DOE first met Nassar, she was restricted to a wheelchair.

311.   A.W. DOE's mother accompanied her to the visit.

312.   During her first appointment with Nassar at the Michigan State University Sports Medicine Clinic, he instructed A.W. DOE to undress from the waist down and lay face down on a table.

313.   Nassar, by characterizing his activities as "medical treatment", convinced Plaintiff that his sexual assault of her was in fact appropriate and necessary to achieve a cure for her medical problems.

314.   Plaintiff was sexually assaulted under the guise of "medical treatments" by Nassar during medical appointments in 2001-2002.

315.   The "treatment" involved prolonged and intense manipulation of Plaintiff's vaginal area, including digital penetration into her vagina with his finger and thumb without prior notice and without gloves or lubricant under the guise of performing "treatment."

316.   During the "treatment," Nassar began to massage A.W. DOE in the lower back.

317.   Without any additional explanation or prior notice of what he was going to do, Nassar then inserted his fingers and/or thumb into A.W. DOE's vagina while pushing on her back.

318.   Nassar held his fingers and/or thumb in A.W. DOE's vagina.

319.   Throughout the next 30-60 minutes, he would repeatedly penetrate A.W. DOE's vagina in the same way.

320.   Following that visit, A.W. DOE saw Nassar at least 3-5 more times on an almost weekly basis.

321.   Throughout the rest of her high school career and until she graduated, A.W. DOE would sporadically treat with Nasser.

322.   At each office visit, Nassar would repeat sexual assaults on A.W. DOE in a similar manner.

323.   Plaintiff did not treat or intend to treat with Nassar for issues related to obstetrics or gynecology (hereinafter "OB/GYN").

324.   Plaintiff believes the conduct by Nassar was sexual assault, abuse, and molestation and for Nassar's pleasure and self-gratification.

325.   As a result of the assault, Plaintiff A.W. DOE has struggled with feelings of embarrassment, disgust, humiliation, and deep sadness.

326.   A.W. DOE has suffered emotional distress and turmoil in the years since as a direct and proximate result of these assaults.

## COUNT I: TITLE IX VIOLATIONS

### 20 U.S.C. §1681(a), *et seq.*

#### *against MSU and MSU Trustees*
#### (Both Plaintiffs)

327.   Plaintiffs restate and incorporate herein all previously stated allegations.

328.   Title IX states, "No person in the United States shall on the basis of sex be ... subject to discrimination under any education program or activity receiving Federal financial assistance ...."

329. Plaintiffs are "persons" covered by the Title IX statutory language.

330. Plaintiffs participated in "activities" and/or "programs" that were part of the operations of MSU. 20 U.S.C. § 1687.

331. MSU receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. §§ 1681(a), 1687.

332. Defendant MSU is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

333. Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students, and third parties.

334. Nassar's actions and conduct were carried out under one of MSU's programs, which provides medical treatment to students, athletes, and the public.

335. Defendant Nassar's conduct and actions toward Plaintiffs, including nonconsensual digital vaginal penetration, touching Plaintiffs' buttocks and genitals constitute sex discrimination under Title IX.

336. As early as 1997/1998, 1999 and/or 2000, based on the complaints alleged above, an "appropriate person" at Defendant MSU had actual knowledge of the sexual assault, abuse, and molestation committed by Defendant Nassar upon female patients, including Klages, Bert and Stollack.

337.   The MSU Individual Defendants were "appropriate persons" within the meaning of Title IX because in their positions, they had the authority to address and/or report the discrimination, request investigations, and/or institute corrective measures.

338.   Defendants Strampel, Kovan and Dietzel had supervisory authority over Nassar with the ability to discipline, suspend or terminate Nassar, or to direct or cause others to discipline, suspend or terminate Nassar.

339.   The response of MSU's personnel to reports of sexual abuse was clearly unreasonable in light of the known circumstances.

340.   The MSU Individual Defendants failed to carry out their duties to investigate and take corrective action under Title IX following multiple complaints of sexual assault, abuse and molestation from 1997/1998- 2014.

341.   Even after 2014, the MSU Defendants and, among others, Defendants Kovan, Dietzel, and Strampel failed to supervise or otherwise ensure that Defendant Nassar complied with the newly imposed institutional guidelines even though the MSU Defendants had actual knowledge that Nassar posed a substantial risk of additional sexual abuse of females to whom he had unfettered access.

342.   The MSU Institutional and Individual Defendants acted with deliberate indifference to known acts of sexual assault, abuse, and molestation

on its premises by failing to investigate and address multiple allegations of sexual harassment and abuse as required by Title IX, and failing to institute corrective measures to prevent Defendant Nassar from violating and sexually abusing other female patients.

343.   The MSU Institutional and Individual Defendants, acted with deliberate indifference as their lack of response to the allegations of sexual assault, abuse, and molestation was clearly unreasonable in light of the known circumstances, Defendant Nassar's actions with female athletes, and his access to young girls and young women.

344.   The MSU Defendants' deliberate indifference was confirmed by the Department of Education's investigation into Defendant MSU's handling of sexual assault and relationship violence allegations which revealed that a sexually hostile environment existed and affected numerous students and staff on Defendant MSU's campus, and that the University's failure to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner caused and may have contributed to a continuation of the sexually hostile environment.

345.   The sexual abuse Plaintiffs suffered was so severe, pervasive and objectively offensive that it deprived her of an educational activity, including medical care.

346.   Between the dates of approximately 1996 and 2016, the MSU Defendants acted in a deliberate, grossly negligent, and/or reckless manner when they failed to reasonably respond to Defendant Nassar's sexual assaults and sex-based harassment of Plaintiffs and others.

347.   As a result of Defendants' conduct, Plaintiffs suffered, among other things, humiliation, anguish, intimidation, emotional distress and loss of self-esteem.

348.   To the best of Plaintiffs' knowledge, the MSU Defendants did not have or enforce a policy which required their patients to have the presence of a nurse or other attendant present when treating in a private or sensitive area.

WHEREFORE, Plaintiffs claim judgment against the Defendants in an mount to which they are found to be entitled together with costs, interest and such statutory attorney fees and other fees as may be allowed by law.

## COUNT II: SEX DISCRIMINATION
## PATIENT PROTECTION AND AFFORDABLE CARE ACT §1557, 42 U.S.C. §18116

### *against Defendants MSU and MSU Trustees*

### (Both Plaintiffs)

349.   Plaintiffs restate and incorporate here all previously stated allegations.

350.   Section 1557 of the Patient Protection and Affordable Care Act, which is codified at 42 U.S.C. §18116, provides that: Except as otherwise

provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under . . . [T]itle IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this [T]itle (or amendments). The enforcement mechanisms provided for and available under . . . [T]itle IX shall apply for purposes of violations of this subsection.

351. Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. prohibits sex discrimination in programs that receive federal financial assistance.

352. Plaintiffs, as women, have a right under 42 U.S.C. §18116 to receive health care services free from discrimination on the basis of sex.

353. Plaintiffs are "individuals" within the meaning of 42 U.S.C. §18116.

354. Defendant MSU receives Federal financial assistance within the meaning of 42 U.S.C. §18116 because it receives federal financial assistance such as credits, subsidies, or contracts of insurance.

355.   The MSU Defendants employed the services of Defendant Nassar, doctors, and other professional and non-professional health care providers who cared for Plaintiffs from approximately 1997 to 2016, and held themselves out to the public as competent, careful, and experienced in the care and treatment of patients.

356.   Plaintiffs received medical care from Defendant Nassar at the MSU Sports Medicine Clinic, other MSU related facilities, and at other locations where Nassar provided services as an MSU employee.

357.   Plaintiffs expected to receive medical care for their injuries without being sexually assaulted and without fear of sexual harassment or assault.

358.   Defendant Nassar's conduct and actions toward Plaintiffs, that being nonconsensual and assaultive digital vaginal penetration, touching of Plaintiffs' vaginal area, touching of Plaintiffs' genitals and buttocks constitute sex discrimination under Title IX and 42 U.S.C. § 18116, and otherwise denied Plaintiff the benefits of appropriate medical care.

359.   The MSU Individual Defendants and others knew or should have known of Nassar's abuse yet failed to take corrective action.

360.   MSU is vicariously and/or contractually liable for the actions of their principals, employees, agents, and representatives.

361. MSU and Defendants Strampel, Kovan, Dietzel, and Lemmen supervised Nassar and/or were in a position to take appropriate action upon learning of concerns of misconduct as early as 1997.

362. MSU and Defendants Strampel, Kovan, and Dietzel failed to supervise Nassar in a way that would protect Plaintiffs and other from sexual assault.

363. MSU and Defendants Strampel, Kovan, and Dietzel failed to properly train and supervise Nassar related to his treatment of Plaintiffs and with respect to promulgating and enforcing policies and procedures related to patient safety (e.g. use of gloves; consent; nurse attendants, etc.).

364. Defendant Lemmen failed to report Nassar's sexual assaults of patients to his supervisors.

365. Because of Defendants' inaction and deliberate indifference, Defendants forced Plaintiffs to endure unnecessary pain, trauma, humiliation, and duress.

366. Because of Plaintiffs' sex, Defendants treated Plaintiffs with a lack of care, dignity, and respect.

367. The conduct of the MSU Defendants described above constitutes sex discrimination against Plaintiffs.

368.   The MSU Defendants perpetrated this discrimination with malice, deliberate disregard for, or deliberate or reckless indifference to Plaintiffs' rights.

369.   The MSU Defendants' failure to promptly and appropriately investigate, respond to, and remedy the sexual assaults after they received repeated notice of Defendant Nassar's wrongdoing subjected Plaintiffs and countless others to further sexual harassment and sexual assaults as well as a sexually hostile environment—effectively denying them all access to health programs or activities at MSU, and effectively denying them the benefits of appropriate medical care.

370.   In the alternative, the actions or inaction of the MSU Defendants was deliberately indifferent or so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages.

WHEREFORE, Plaintiffs claim judgment against the Defendants in an mount to which they are found to be entitled together with costs, interest and such statutory attorney fees and other fees as may be allowed by law.

## COUNT III: VIOLATION OF BODILY INTEGRITY 42 U.S.C. § 1983

### *against MSU Individual Defendants*
**(Both Plaintiffs)**

371.  Plaintiffs restate and incorporate here all previously stated allegations

372.  Plaintiffs, as females, are members of a protected class under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

373.  Plaintiffs also enjoy the constitutionally protected Due Process right guaranteed by the Fourteenth Amendment to be free from the invasion of bodily integrity through sexual assault, abuse, or molestation.

374.  At all relevant times the MSU Individual Defendants were acting under color of law.

375.  The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in the Individual Defendants' positions should have known.

376.  At all relevant times, Defendants Strampel, Dietzel, and Kovan had the ultimate responsibility and authority to train and supervise their employees, subordinates, agents, and/or representatives in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestation and

as a matter of acts, custom, policy, and/or practice, failed to do so with deliberate indifference.

377.   As a matter of custom, policy, and and/or practice, the MSU and Defendants Strampel, Dietzel, and Kovan had and have the ultimate responsibility and authority to investigate complaints against their employees, subordinates, and representatives from all individuals including, but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

378.   At all relevant times, MSU and the MSU Individual Defendants had a duty to prevent sexual assault, abuse, and molestation on their campus and premises, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

379.   Defendant MSU's internal policies provide that "[a]ll University employees ... are expected to promptly report sexual misconduct or relationship violence that they observe or learn about and that involves a member of the University community (faculty, staff or student) or occurred at a University event or on University property." They state further: "[t]he employee must report all relevant details about the alleged relationship violence or sexual misconduct that occurred on campus or at a campus-sponsored event. . ."

380. Defendant MSU's above-mentioned internal policies were violated when MSU and the MSU Individual Defendants took no actions to address the complaints regarding Defendant Nassar's conduct, including those by Larissa Boyce in or around 1997/1998, Christie Achenbach in or around 1999, Tiffany Thomas Lopez in 2000 (on more than one occasion), Jennifer Rood Bedford between approximately 2000 and 2002, Kyle Stephens in or around 2004; and Plaintiff Jane JD Doe in or around 2014.

381. The MSU Individual Defendants' failure to address these complaints led to an unknown number of individuals being victimized, sexually assaulted, abused, and molested by Defendant Nassar.

382. These failures and the harm they caused shock the conscience of the court.

383. These MSU Individual Defendants, who had or should have had knowledge Nassar's misconduct, were the moving forces or causes of repeated constitutional injuries to Plaintiffs and others based on their failures to report, train, supervise, investigate, or otherwise act in response to complaints of Defendant Nassar's conduct.

384. Ultimately, the MSU Individual Defendants failed to adequately and properly investigate complaints of abuse including but not limited to failing to:

a. perform a thorough investigation into improper conduct by Nassar with female patients after receiving complaints in 1997/1998, 1999, 2000, between 2000 and 2002, 2004, and 2014;

b. thoroughly review and investigate all policies, practices, procedures and training materials related to the circumstances surrounding the conduct of Defendant Nassar;

c. recognize sexual assault when reported in 2014 and permitting University officials to deem sexual assault as "medically appropriate" and "not of a sexual nature;" and,

d. ensure all institutional guidelines issued following the 2014 investigation into Defendant Nassar's conduct were satisfied.

385. As indicated in the U.S. Department of Education Office of Civil Rights report, the MSU had a culture that permitted a sexually hostile environment to exist affecting numerous individuals.

386. Also indicated in the report was MSU's custom, practice, and/or policy of failing to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner which caused and may have contributed to a continuation of the sexually hostile environment.

387. By failing to prevent the above-mentioned sexual assault, abuse, and molestation upon Plaintiffs, and by failing to appropriately respond to reports of

Nassar's sexual assault, abuse, and molestation in a manner that was so clearly unreasonable it amounted to deliberate indifference, the MSU Individual Defendants are liable to Plaintiffs pursuant to 42 U.S.C. §1983.

388.    The MSU Individual Defendants' conduct and failures to act deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

389.    Defendants Strampel, Dietzel, and Kovan tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline Defendant Nassar, with the result that Defendant Nassar could violate the rights of persons such as Plaintiffs with impunity.

390.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered, among other things, humiliation, degradation, intimidation, confusion and emotional distress.

WHEREFORE, Plaintiffs claim judgment against the Defendants in an mount to which they are found to be entitled together with costs, interest and such statutory attorney fees and other fees as may be allowed by law.

## COUNT IV: STATE CREATED DANGER 42 U.S.C. § 1983

### *against MSU Individual Defendants*
### (Both Plaintiffs)

391.    Plaintiffs restate and incorporate here all previously stated allegations.

392.   Plaintiffs enjoyed a substantive due process right guaranteed by the Fourteenth Amendment to avoid the risk of harm or danger created or increased by an affirmative act of the state.

393.   This right is violated when the state:

a. engages in an affirmative act which either created or increased the risk that a plaintiff would be exposed to an act of violence by a third party;

b. created or enhanced a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and

c. the state knew or should have known that its actions specifically endangered the plaintiff.

394.   The MSU Individual Defendants' acts consisted of:   1) permitting, condoning and promoting Nassar's expertise so that he could have sexual access to children under the guise of medical treatment and then; 2) lying about or concealing its knowledge that Nassar, by virtue of their actions, was permitted to carry out his unlawful and abhorrent behavior.

395.   These affirmative acts created or increased the risk that Plaintiffs would be exposed to an act of sexual violence by Nassar.

396.   Defendants' conduct created a special danger to Plaintiffs because their actions specifically put this discrete group at increased risk in that the

State knew that Nassar was taking advantage of the sacred patient-physician relationship to carry out his sexual violence against Plaintiffs.

397. Defendants knew or should have known that its affirmative acts specifically endangered Plaintiffs.

398. Defendants acted in ways, which permitted, condoned and promoted Nassar's access to victims so that he could digitally penetrate the vaginaa and anuses of the children who sought treatment from him.

399. These actions included Defendant's:

    a. failing to supervise, train and educate Nassar, Nassar's manager or Nassar's patients or their parents so that so that, in the absence of this supervision, training and education Nassar's, unlawful activities could be carried out;

    b. actively concealing Nassar's abhorrent behavior;

    c. outright lying to patients, parents, investigators, and law enforcement when confronted with the allegations against Nassar and this lying prevented the detection of Nassar's misconduct and served to cover up Defendants' liability for the damage he caused; and

    d. promoting Nassar as the physician to the world-wide stars of gymnastics knowing that, by promoting Nassar in this fashion,

Defendants were enabling Nassar to gain unfettered sexual access to more children.

400.   Defendants' acts of permitting, condoning and promoting Nassar, which enabled him to gain unfettered sexual access to children, exposed his "patients" to unspeakable invasions of their bodily integrity which were so egregious and outrageous that it shocks the conscience.

401.   As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered, among other things, humiliation, degradation, intimidation, confusion and emotional distress.

WHEREFORE, Plaintiffs claim judgment against the Defendants in an mount to which they are found to be entitled together with costs, interest and such statutory attorney fees and other fees as may be allowed by law.

## COUNT V: FAILURE TO TRAIN AND SUPERVISE 42 U.S.C. §1983

### *against Defendants Strampel, Dietzel, and Kovan*
### (Both Plaintiffs)

402.   Plaintiffs restate and incorporate here all previously stated allegations.

403.   The MSU Defendants and Defendants Strampel, Kovan and Dietzel have the ultimate responsibility and authority to train and supervise its employees, agents, and/or representatives including Defendant Nassar and all faculty and staff regarding their duties toward students, faculty, staff, and visitors.

404.   The MSU Defendants and Defendants Strampel, Kovan and Dietzel failed to train and supervise their employees, agents, and/or representatives including all faculty and staff, regarding the following duties:

a.  perceive, report, and stop inappropriate sexual conduct on campus;

b.  provide diligent supervision over student-athletes and other individuals;

c.  report suspected incidents of sexual abuse or sexual assault;

d.  ensure the safety of all students, faculty, staff, and visitors to Defendant MSU's campuses premises;

e.  provide a safe environment for all students, faculty, staff, and visitors to Defendant MSU's premises free from sexual harassment; and,

f.  properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

405.   The above list of duties is not exhaustive.

406.   Defendants Strampel, Kovan and Dietzel had supervisory authority over Defendant Nassar.

407.   MSU and Defendants Strampel, Kovan and Dietzel's failure to adequately supervise or investigate Defendant Nassar, especially after MSU knew or should have known of complaints regarding his nonconsensual sexual

touching and assaults during "treatments" was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

408. MSU and Defendants Strampel, Kovan and Dietzel failed to train Defendant Nassar regarding inappropriate touching, informed consent and chaperone practices, which was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

409. MSU and Defendants Strampel, Kovan and Dietzel failed to adequately train coaches, trainers, medical staff, and others regarding the aforementioned duties, which led to violations of Plaintiffs' rights.

410. As a result, MSU and Defendants Strampel, Kovan and Dietzel deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

411. As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered, among other things, humiliation, degradation, intimidation, confusion and emotional distress.

WHEREFORE, Plaintiffs claim judgment against the Defendants in an mount to which they are found to be entitled together with osts, interest and such statutory attorney fees and other fees as may be allowed by law.

## COUNT VI: GROSS NEGLIGENCE NOT SUBJECT TO IMMUNITY, MCL §691.1407

*against MSU Individual Defendants*
**(Both Plaintiffs)**

412.   Plaintiffs restate and incorporate here all previously stated allegations.

413.   The MSU Individual Defendants owed Plaintiffs a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with MSU's employees, representatives, and/or agents, including Defendant Nassar.

414.   The MSU Individual Defendants owed Plaintiffs a duty of due care in providing medical treatment, supervising athletic coaching, and responding to complaints of sexual assault as employees, agents, and/or representatives of MSU.

415.   When Plaintiffs sought and received medical treatment from Defendant Nassar in the course of his employment, agency, and/or representation of MSU, a special, confidential, and fiduciary relationship between Plaintiffs and Defendants Nassar was created, resulting in Defendant Nassar owing Plaintiffs a duty to use due care.

416.   MSU's internal policies provide that "[a]ll University employees ... are expected to promptly report sexual misconduct or relationship violence that they observe or learn about and that involves a member of the University

79

community (faculty, staff or student) or occurred at a University event or on University property." They state further: "[t]he employee must report all relevant details about the alleged relationship violence or sexual misconduct that occurred on campus or at a campus-sponsored event... ".

417. MSU's aforementioned internal policies were violated when the MSU Individual Defendants and others took no actions to address the complaints regarding Defendant Nassar's conduct alleged above.

418. The MSU Individual Defendants' and others' failure to address the above complaints led to an unknown number of individuals being victimized, sexually assaulted, abused, and molested by Defendant Nassar.

419. The MSU Individual Defendants and others were the moving forces or cause of repeated constitutional injuries to Plaintiffs based on a failure to report, train, supervise, investigate, or otherwise act in response to complaints of Defendant Nassar's conduct.

420. The MSU Individual Defendants' failure to report, supervise or investigate Defendant Nassar, especially after MSU knew or should have known of complaints regarding his nonconsensual sexual touching and assaults during "treatments" were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

421.   Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiffs in the course of his employment, agency, and/or representation of the MSU Individual Defendants and under the guise of rendering "medical treatment" was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

422.   The MSU Individual Defendants' conduct demonstrated a willful disregard for substantial risks to Plaintiffs and precautions to ensure Plaintiffs' safety.

423.   The MSU Individual Defendants breached duties owed to Plaintiffs and were grossly negligent when they conducted themselves by the actions described above, said acts having been committed with reckless disregard for Plaintiffs' health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

WHEREFORE, Plaintiffs claim judgment against the Defendants in an mount to which they are found to be entitled together with costs, interest and such statutory attorney fees and other fees as may be allowed by law.

## COUNT VII: VIOLATION OF THE ELLIOTT LARSEN CIVIL RIGHTS ACT, ARTICLE 4, DISCRIMINATION IN THE PROVISION OF EDUCATIONAL PROGRAMS

### *against MSU Individual Defendants*
**(Both Plaintiffs)**

424.   Plaintiffs restate and incorporate here all previously stated allegations.

81

425.   MSU is an education institution.

426.   The MSU Individual Defendants are all "persons" under Elliott Larsen Civil Rights Act .

427.   Plaintiffs are all individuals protected by ELCRA because they utilized or sought to utilize services and programs provided by MSU.

428.   ELRCA prohibits discrimination "against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provide by the institution because of" *inter alia* sec. M.C.L. § 37.2402(a).

429.   ELCRA prohibits two or more persons from conspiring to "[a]id, abet, incite, compel, or coerce a person to engage in a violation" of the act, including discriminating against an individual utilizing services provided by an educational institution. M.C.L. § 37.2701(b).

430.   ELCRA prohibits an individual from acting to "[a]id, abet, incite, compel, or coerce a person to engage in a violation" of the act, including discriminating against an individual utilizing services provided by an educational institution. M.C.L. § 37.2701(b).

431.   ELCRA prohibits two or more persons from conspiring to "[a]ttempt directly or indirectly to commit an act prohibited by the act," including

discriminating against an individual utilizing services provided by an educational institution. M.C.L. § 37.2701(c).

432.    ELCRA prohibits an individual from acting to ""[a]ttempt directly or indirectly to commit an act prohibited by the act," including discriminating against an individual utilizing services provided by an educational institution. M.C.L. § 37.2701(c).

433.    Sex discrimination prohibited by ELCRA includes unwelcome sexual conduct, sexual assault and other forms of unwelcomed physical sexual contact.

434.    As alleged in detail above, Nassar perpetrated acts of sexual assault, unwelcomed physical sexual contact, and unwelcomed and nonconsensual sexual conduct, on Plaintiffs.

435.    Nassar committed these acts of sexual assault, unwelcomed sexual contact, and unwelcomed and nonconsensual sexual conduct as an employee of MSU and while providing services as a clinician treating Plaintiffs, who were patients of MSU's medical facilities and/or students and athletes participating in MSU's educational programs.

436.    The MSU Individual Defendants knew that Nassar was committing acts of sexual assault, unwelcomed sexual contact, and unwelcomed and nonconsensual sexual conduct on his patients and the students and athletes being treated by him.

437.   The MSU Individual Defendants conspired to aid, abet, abet, incite, compel and/or coerce Plaintiffs to submit to Nassar's acts of sexual assault, unwelcomed sexual contact, and unwelcomed and nonconsensual sexual conduct in ways alleged above, not limited to:

a.  failing to investigate complaints they received regarding his unlawful acts against his patients,

b.  informing Plaintiffs and their parents and guardians in person that Nassar was a world-renowned physician whose techniques were above reproach, even though they knew that he sexually assaulted his patients;

c.  publishing online and in written materials Nassar's affiliation with MSU and his world renown as a physician, even though they knew that he sexually assaulted his patients;

d.  failing to discipline or fire Nassar when they first learned of his unlawful conduct, which allowed him to continue treating patients, including Plaintiffs, and continue his acts of sexual assault, and

e.  actively encouraging and referring Plaintiffs—their students, athletes, and patients—to seek Nassar's treatment, knowing that they were subjecting Plaintiffs to Nassar's sexual assaults.

438. As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered, among other things, humiliation, degradation, intimidation, confusion and emotional distress.

WHEREFORE, Plaintiffs claim judgment against the Defendants in an mount to which they are found to be entitled together with costs, interest and such statutory attorney fees and other fees as may be allowed by law.

## COUNT VIII: VIOLATION OF ELCRA, ARTICLE 3, DENIAL OF PUBLIC ACCOMMODATIONS AND SERVICES

### against MSU Individual Defendants, USAG, Steve Penny, Twistars, Van Horn, USOC and John Geddert
### (Both Plaintiffs)

439. Plaintiffs restate and incorporate here all previously stated allegations.

440. ELCRA defines a "place of public accommodation" as "a business, or an education, refreshment, entertainment, recreation, health, or transportation facility, or institution of any kind, whether licensed or not, whose services, facilities, privileges, advantages, or accommodations are excluded, offered, sold or otherwise available to the public." This definition specifically includes sports and athletic clubs. M.C.L. § 37.2301(a).

441. ELCRA defines a "public service" as "a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof or a tax exempt private agency established to provide service to the public." M.C.L. § 37.2301(b).

85

442.   MSU is both a "place of public accommodation" and a "public service" as defined by ELCRA.

443.   Twistars is a "place of public accommodation" as defined by ELCRA.

444.   USAG is a "place of public accommodation" as defined by ELCRA.

445.   All individual and institutional Defendants are "persons" under ELCRA.

446.   ELCRA prohibits a person from "deny[ing] an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of" *inter alia* M.C.L. § 37.2402(a).

447.   Sex discrimination prohibited by ELCRA includes unwelcome sexual conduct, sexual assault and other forms of unwelcomed physical sexual contact.

448.   As alleged in detail above, Nassar perpetrated acts of sexual assault, unwelcomed physical sexual contact, and unwelcomed and nonconsensual sexual conduct, on Plaintiffs.

449.   Nassar committed these acts of sexual assault, unwelcomed sexual contact, and unwelcomed and nonconsensual sexual conduct as an employee of MSU and while providing services as a clinician treating Plaintiffs, who were patients of MSU's medical facilities and/or students and athletes participating in MSU's educational programs.

450. Nassar committed these acts of sexual assault, unwelcomed sexual contact, and unwelcomed and nonconsensual sexual conduct on Plaintiffs when he was an employee, agent and/or representative of USAG and providing medical and training services to Plaintiffs in that capacity.

451. Nassar committed these acts of sexual assault, unwelcomed sexual contact, and unwelcomed and nonconsensual sexual conduct on Plaintiffs as an employee, agent, and/or representative of Twistars and providing medical and training services to Plaintiffs in that capacity.

452. Defendants and their employees, agents and representatives knew that Nassar was committing acts of sexual assault, unwelcomed sexual contact, and unwelcomed and nonconsensual sexual conduct on his patients and the students and athletes being treated by him.

453. Defendants and their employees, agents and representatives denied Plaintiffs access to training and treatments that were free of sexual assault, unwelcomed sexual contact, and unwelcomed and nonconsensual sexual conduct in ways alleged above, not limited to:

    a. failing to investigate complaints they received regarding his unlawful acts against his patients,

    b. informing Plaintiffs and their parents and guardians in person that Nassar was a world-renowned physician whose techniques were

above reproach, even though they knew that he sexually assaulted his patients;

c. publishing online and in written materials Nassar's affiliation with their institutions and his world renown as a physician, even though they knew that he sexually assaulted his patients;

d. failing to discipline or fire Nassar when they first learned of his unlawful conduct, which allowed him to continue treating patients, including Plaintiffs, and continue his acts of sexual assault, and

e. ctively encouraging and referring Plaintiffs—their students, athletes, and patients—to seek Nassar's treatment, knowing that they were subjecting Plaintiffs to Nassar's sexual assaults.

454. As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered, among other things, humiliation, degradation, intimidation, confusion and emotional distress.

WHEREFORE, Plaintiffs claim judgment against the Defendants in an mount to which they are found to be entitled together with costs, interest and such statutory attorney fees and other fees as may be allowed by law.

## COUNT IX: FAILURE TO REPORT CHILD ABUSE, CHILD PROTECTION LAW, M.C.L. § 722.633

### against Defendants Strampel, Kovan, Dietzel, Klages, Lemmen, and Stollak (Both Plaintiffs)

455.   Plaintiffs restate and incorporate here all previously stated allegations.

456.   Michigan's Child Protection Law, M.C.L. § 722.621 *et seq.*, ("CPL") established mandatary guidelines for reporting suspected child abuse or neglect and provides penalties for failure to report child abuse or neglect.

457.   Among the individuals who are mandatory reports under the CPL are physicians, psychologists and licensed therapists, and school administrators, counselors, and teachers. M.C.L. § 722.623.

458.   At all relevant times, Defendants Strampel, Kovan, Dietzel, Lemmen, Klages and Stollak were mandatory reporters under the CPL.

459.   The CPL defines "child abuse" as "harm or threatened harm to a child's health or welfare that occurs through nonaccidental physical or mental injury, sexual abuse, sexual exploitation, or maltreatment, by a parent, a legal guardian, or any other person responsible for the child's health or welfare or by a teacher, a teacher's aide, or a member of the clergy." M.C.L. § 722.622(g).

460.   Nassar was at all relevant time a person "responsible for the child's health or welfare" when he provided medical "treatment" to Plaintiffs who were minors at the time.

461. Nassar committed multiple, repeated acts of sexual abuse and sexual exploitation on Plaintiffs when they were children.

462. The CPL imposes civil liability for damages proximately caused by a mandatory reporter's failure to report child abuse. M.C.L. § 722.633(1).

463. Defendant Klages received complaints from minors beginning in 1997 of Nassar's sexual assaults and failed to report this as required of her by the CPL.

464. Defendant Stollak was informed by a child he was treating in 2004 that Nassar had sexually assaulted her and he failed to report this as required of him by the CPL.

465. Defendant Strampel was Dean of the MSU School of Osteopathic Medicine starting in December 2001, and from that time on he and/or his employees had received complaints of Nassar's sexual abuse of minors, yet failed to report this as required of him by the CPL.

466. Defendant Dietzel was Clinical Director of MSU Sports Medicine starting in 2004, and from that time on he and/or his employees had received complaints of Nassar's sexual abuse of minors, yet failed to report this as required of him by the CPL.

467. Defendant Kovan was Director of Sports Medicine since 1995, and from 1997 or 1998 on, he and/or his employees had received complaints of

Nassar's sexual abuse of minors, yet failed to report this as required of him by the CPL.

468. Defendant Lemmen served as a clinician at the MSU Sports Medicine Clinic from 2010 to 2017 and received information of Nassar's sexual abuse of minors during this time, yet failed to report this as required of her by the CPL.

469. As a result of Defendants' failure to report the sexual abuse reports and information they had, no formal investigations of Nassar were initiated.

470. As a result, Nassar continued to sexually assault his patients, including Plaintiffs.

471. Plaintiffs suffered injuries as a direct result of Defendants' failures to report their knowledge of Nassar's sexual abuse of minors to the appropriate authorities.

WHEREFORE, Plaintiffs claim judgment against the Defendants in an mount to which they are found to be entitled together with Costs, interest and such statutory attorney fees and other fees as may be allowed by law.

## COUNT X: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### *Against MSU Individual Defendants, USAG, Steve Penny, Twistars, Van Horn, USOCand John Geddert*
### (Both Plaintiffs)

472. Plaintiffs restate and incorporate here all previously stated allegations.

473.   Defendants were aware that Nassar was committed sexual assaults on the patients, students, and athletes in their care.

474.   Defendants took no actions investigate, report, or otherwise end Defendant Nassar's sexual assault of these patients, students, and athletes.

475.   Defendants' failures to address the above complaints led to Plaintiffs being victimized, sexually assaulted, abused, and molested by Defendant Nassar.

476.   Defendants' repeated failures to address the complaints of Nassar's sexual abuse of patients in his care was extreme and outrageous in its wanton disregard for the safety and welfare of the patients, students and athletes in their charge.

477.   Defendants acted intentionally, in that they received complaints and knew about the sexual abuse and actively sought to suppress it and persuade the individuals voicing complaints that they did not understand what a proper medical procedure was, even though Defendants at all times knew that Nassar's sexual assaults were not consistent with any proper medical procedure.

478.   As a result of Defendants' failures to address the complaints of sexual assaults, Plaintiffs were subjected to Nassar's sexual assaults.

479.   Plaintiffs experience emotional distress and related injuries because of Defendants' conduct.

WHEREFORE, Plaintiffs claim judgment against the Defendants in an mount to which they are found to be entitled together with Costs, interest and such statutory attorney fees and other fees as may be allowed by law.

## COUNT XI: NEGLIGENCE

### *against MSU Individual Defendants, USAG, Steve Penny, Twistars, Van Horn, USOC and John Geddert*
### (Both Plaintiffs)

480.   Plaintiffs restate and incorporate here all previously stated allegations.

481.   Defendants owed Plaintiff a duty to use due care to ensure her safety and freedom from sexual assault, abuse, and molestation while interacting with themselves and their employees, representatives, and/or agents, including Defendant Nassar.

482.   Defendants owed Plaintiffs a duty of due care in providing medical treatment, supervising athletic coaching, and responding to complaints of sexual assault.

483.   Nassar owed Plaintiffs a duty of ordinary care in providing medical treatment, and this duty included to not sexually assault his patients.

484.   Defendants owed Plaintiffs a duty of care to properly supervise and train all employees, agents and representatives who provided services to the patients, students, and athletes in their programs and using their facilities.

485.   Defendants had a duty to investigate, discipline, and sever the employment, agency, or relationship of its employees, agents and representatives accused or suspected of committed sexual assaults or other misconduct on the patients, students and athletes in their programs and using their services.

486.   When Plaintiffs sought and received medical treatment from Defendant Nassar in the course of his employment, agency, and/or representation of MSU, USAG, and Twistars, a special, confidential, and fiduciary relationship between Plaintiffs and Nassar was created, resulting in Nassar owing Plaintiffs a duty to use due care.

487.   Nassar was an employee, agent and representative of Defendants; therefore, Defendants had vicarious liability for the acts and omissions by Nassar. Defendants breached their duty of care when they failed to supervise and train Nassar and failed to ensure Plaintiffs' freedom from sexual assault when receiving treatments and services provided under their aegis.

488.   Defendants breached their above-mentioned duties of care by their acts and omissions that led to Nassar not being investigated and his sexual assaults not being addressed for nearly 20 years.

489.   Defendants' breaches of their above-mentioned duties led to an unknown number of individuals—including Plaintiffs—being victimized,

sexually assaulted, abused, and molested by Defendant Nassar.

490. As both a direct and proximate result of Defendants above-mentioned acts and omissions in breach of their duties, Plaintiffs suffered and continue to suffer many physical and emotional pains and injuries.

WHEREFORE, Plaintiffs claim judgment against the Defendants in an mount to which they are found to be entitled together with Costs, interest and such statutory attorney fees and other fees as may be allowed by law.

## COUNT XIII – SEXUAL ASSAULT BY LAWRENCE GERARD NASSAR

491. Plaintiffs restate and incorporate here all previously stated allegations.

492. The conduct of the Defendant Nassar as set forth in the preceding allegations of the complaint constitute criminal sexual conduct within the meaning of 2018 P.A. 183, i.e. MCL 600.5805.

493. Said conduct further constitutes sexual assault and battery committed on a minor in violation of MCL750.520b(1)(b)

WHEREFORE, Plaintiffs claim judgment against the Defendants in an mount to which they are found to be entitled together with Costs, interest and such statutory attorney fees and other fees as may be allowed by law.

## THIS COMPLAINT IS TIMELY PURSUANT TO MICHIGAN 2018 PA 183

494. On June 12, 2018, the Michigan Legislature established rights in Plaintiffs which did not exist before that date. 2018 PA 183.

495.   The rights established by enactment of 2018 PA 183 are applicable to

Plaintiffs because:

    a.   The events alleged in this Complaint occurred while Plaintiffs were

        minors and  after December 31,1996 and more than two years before

        June 12, 2018;

    b.   Nassar was convicted of criminal sexual conduct against a
    person under section 520b of the Michigan penal code, 1931 PA 328,
    MCL 750.520b;

    c.   Nassar admitted that he was in a position of authority over
    Plaintiffs as their physician and used that authority to coerce Plaintiffs
    to submit; or

    d.   Nassar engaged in purported medical treatment or examination
    of Plaintiffs in a manner that is, or for purposes that are, medically
    recognized as unethical or unacceptable.

496.   As a direct and proximate result of the unconstitutional acts of

Defendants as alleged in this complaint, Plaintiffs have experienced serious and

in some cases life threatening and irreversible psychological damage; Plaintiffs

have and will incur substantial economic losses in the nature of medical

expenses, lost wages; Plaintiffs are entitled to an award of non-economic

damages in the nature of pain and suffering, embarrassment, outrage, mental

anguish, fear and mortification, and stress related physical symptoms such as

sleepiness, gastro-intestinal discomfort, anxiety and symptoms similar to  post-

traumatic syndrome.

## RELIEF REQUESTED

In addition to the relief requested in the preceding counts, Plaintiffs request that the Court enter an order granting Plaintiff all available relief and remedies allowable under the law, including but not limited to:

a. An Order establishing a Truth and Reconciliation Commission, or a similar government sanctioned public forum requiring Defendants and their agents and employees to fully and unequivocally admit their responsibility for permitting, condoning and promoting Nassar's abhorrent behavior and lying to cover it up his misconduct, as well as their own culpability for the harm caused to Plaintiffs;

b. An Order requiring Defendants to compensate Plaintiff's for past and future economic and non-economic damages;

c. An Order awarding Plaintiffs punitive damages for Defendants' reckless disregard of their federally protected civil rights;

d. An Order requiring Defendants to pay Plaintiffs' actual attorney fees and costs; and

e. An Order granting Plaintiffs such other legal and equitable relief determined by the Court to be appropriate.

SEIKALY STEWART & BENNETT, P.C.
Attorneys for Plaintiffs

/s/  Jeffrey  T. Stewart
Jeffrey T. Stewart (P24138)
Tiffany R. Ellis (P81456)
30445 Northwestern Highway, Ste. 250
Farmington Hills, MI 48334
(248) 785-0102

Dated:  September 10, 2018

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**A.G. DOE  and A.W. DOE**

     **Plaintiffs,**

**vs.**

**MICHIGAN STATE
UNIVERSITY; THE BOARD OF
TRUSTEES OF MICHIGAN
STATE UNIVERSITY;
LAWRENCE GERARD NASSAR
(individual capacity only);
WILLIAM D. STRAMPEL, D.O.
(individual capacity only);
JEFFREY R. KOVAN D.O.
(individual capacity only);
DOUGLAS DIETZEL, D.O.
(individual capacity only); USA
GYMNASTICS, INC.;
TWISTARS USA, INC. d/b/a
GEDDERTS' TWISTARS USA
GYMNASTICS CLUB, and JOHN
GEDDERT,**

     **Defendants.**

---

SEIKALY STEWART & BENNETT, P.C.
Attorneys for Plaintiffs
Jeffrey T. Stewart (P24138)
30445 Northwestern Highway, Ste. 250
Farmington Hills, MI 48334
(248) 785-0102

---

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a trial by jury of all of the facts and issues involved in this matter and has paid the appropriate jury fee for same.

SEIKALY STEWART & BENNETT, P.C.
Attorneys for Plaintiffs


/s/  Jeffrey T. Stewart (P24138)
30445 Northwestern Highway, Ste. 250
Farmington Hills, MI 48334
(248) 785-0102

Dated:  September 10, 2018

gila3.docx